The case for today is 2023-20491, United States of America v. Abdul-Fatani. May it please the Court, my name is Alan Winograd, I'm representing Abdul-Fatani, and I'd like to be reserving five minutes for my rebuttal. There's two issues I'm arguing today, the first one is that Mr. Fatani was not guilty of wire fraud under count two when he transferred the blank check from Mr. Akil because it was incident to an essential part of the scheme to get the money from the PPP loan. The second thing I'm arguing is that the sentencing for Mr. Fatani was substantially unreasonable. As a background on the facts, Mr. Fatani had three counts under conspiracy to fraud. The first one was for conspiracy to commit wire fraud for filling out a fraudulent loan application to obtain payment protection plan loans, and he did receive that on June 5th in the amount of $511,000. The second count was for wire fraud where he transferred a blank check from himself to Mr. Akil, who was a co-conspirator in the conspiracy, he was actually the mastermind. And the third one was for money laundering, which isn't really relevant to this decision. For a wire fraud case, there's two main elements, which is the scheme to defraud and the use of the wire fraud and furtherance of that fraud. Are you arguing that the scheme to defraud was complete for all scheme participants when the PPP loan funds were deposited in the Route 786 account, or are you arguing that the scheme was complete as to Fatani when the funds were deposited? It was just completed as to Mr. Fatani. Because it continued as to Akil, right? Yes, it did continue as to Akil. Okay. Okay. And what is the significance of that? Well, um, Mr. Akil was, he was the ringleader of the conspiracy, and that was, we admit that that was part of his cut from the scheme. But . . . Unless you admit it's his payoff, isn't that the end of the game in terms of, um, I don't think you filed a reply brief, but the government cites Ricoh Industries, you probably looked at it. Right. And Ricoh Industries makes clear that the scheme to defraud extends to the disbursement of the profits from the fraud. Right. But in this, so in this case, so the cases that say that, the person who received the money is the person, in this case, Mr. Fatani was the transfer of the money, and Mr. Akil was the receiver of the money. In those cases where, where they, the defendant appealed getting that money, he was the one who was supposed to receive it. He wasn't the transfer, he was the receiver of the money, he was, those, the defendant . . . He's the mastermind. He's the mastermind. He wants his cut. Mr. Fatani already received his cut, so there's no reason why he should be found liable, responsible for the wire fraud from him to Mr. Akil, the guy who got the cut. Because Mr. Akil, all those cases, it would, it would be Mr. Akil in those, in that shoes, the person who would be appealing the fact that, well, no, I shouldn't, I shouldn't be found . . . Well, when you have two co-conspirators, the scheme to defraud doesn't depend on one's perspective as to when it ends versus the other's, right? You cite Artledge, which is another case that says schemes to defraud, mail or wire, those are complete when the persons who are intended to receive the profits from the fraud receive it. So your mastermind wants his money, he sets up all these false, you know, he maybe dupes people, but ultimately they cut him checks. What's the case that you've got that says that the fraud is complete when Fatani receives his portion of the loan, but not when he gives the profits of it to the mastermind? What's your best case? Well, my best case is . . . there are two cases I think that support my position, which is the Kahn case and the Mays case. Basically, they say that, that transaction subsequent to getting the main money that they're after, any wire fraud subsequent to that are not part of the main fraud scheme and shouldn't be held liable for that wire fraud. Those aren't multiple conspiracy cases? I sort of thought what you were saying here was there was a constructive amendment, that you were saying the hotel deal predated the PPP loan fraud and Wright wasn't seeing the owner of Tah Investments? Yes. I think that saying, there were several sayings, but he was going to take the fifth. Right. That's not the argument? That's one of my arguments, but that's . . . yeah, that one was a separate . . . that wasn't even a fraud though. Right, but what is your argument . . . maybe let me put it this way. You weren't trial counsel, but a closing argument when defense counsel argued, ladies and gentlemen of the jury, you have not heard that the elements of wire fraud were met. What element was said to not have been, had sufficient facts to support it? Was it Sienter, Fatani was duped from start to finish, or no, Fatani was part of the fraud, but this check was transmitted after the PPP loan fraud scheme was completely over? Right. That's it? It's the latter? You're not disputing Sienter? No.  Okay. What I'm saying is . . . So it all comes down to RICO Industries' knowledge? Yes. You're distinguishing? Yes. Okay. But what I'm saying is, so the transfer of the check from Fatani to Akeel, that had nothing to do with, that had nothing to do with helping as a step into completing the fraud, into getting the loan for the payment protection plan. That's a separate wire fraud, and that just didn't contribute at all to getting that money. It was, once Fatani got the money from the PPP, the scheme, the fraud scheme was over. Because you get two separate wire informations, I guess. You get the wire information, you get one fraud where . . . Just to interrupt, because I'm now looking, you cited Kahn and Mays. Are those in your table of authorities? I think so. How do you spell Kahn? K-A-N-N, or is it Kahn? U.S. versus Kahn? Yes. Okay. I'm not seeing that. Then what's the other one, Mays? U.S. versus Mays. Yes. You probably got your brief. I don't see that either. Okay. I have my brief in front of me. I thought . . . I don't see that either. You want to tell us why you believe those cases apply, and then the other side can file a 28-J on those cases within three business days, since they're not cited. But you can tell us why you believe those support your position. Okay. Well, in Mays . . . I'm sorry. Let's see. In Mays, they both basically say the same thing. In Mays, the defendant stole his roommate's credit cards, used them to rent a hotel room, and then he was convicted because the trial court, the appellate court, stated that after he got the hotel room, the hotel sent the . . . What's the legal proposition? Just quote the legal proposition. Okay. So that use of the wire isn't an essential . . . doesn't have to be an essential scheme. It's just it can facilitate the completion of the scheme, right? Or are they saying something else? Right. So the mail was used after he completed it. After he completed the fraud, the bill was sent to the bank, and they said that had nothing to do with the . . . That's a little different than paying off the mastermind. Under that theory, all the fake . . . I mean, this company had no employees, right? Right. But Fatani's sending checks, fake payroll, right? Yes. So your theory would be none of those could be prosecuted as substantive offenses either? I would think that those might be money laundering, but no. I think all the acts have to be before . . . once he obtains the money, then it's over. The fraud is . . . any acts subsequently do not have . . . are not relevant to committing the main wire fraud, and in this case, obtain the PPP loan. Well, Keel would not have liked that arrangement, right? No. He wouldn't have . . . He wouldn't have set any of this up if he couldn't have gotten his money. No, and what I'm saying, though, is the second count for the wire fraud, it just doesn't fit in as being . . . it's not wire fraud. It might be conspiracy. It might be conspiracy, but it's not directly wire fraud. The count 13, which became count two, the charge . . . I mean, substantive offense date, that cross-incorporated all the conspiracy time, November to April, right? I'm just saying the specific act of sending a blank check . . . I know, but the substantive count cross-incorporated the entire conspiracy period, didn't it? I'm not sure. I'm not sure. It's just specifically just wire fraud and aiding and abetting, possibly. I'm still struggling with the idea that the wire fraud . . . that it's not wire fraud to finish paying out people who are part of the scheme. Is that because you have an argument that you must be doing something deceptive with the wire, and that it's not deceptive with the wire at that point? That could be included. Is that your problem with it? Or, why wouldn't that be part of the scheme to pay everyone involved in the same scheme as of wire fraud? It might be part of the same scheme. I'm just saying it's not a separate count. It probably just should be under the one count, not two separate counts. When he sent that check over to Akio, it's just not a separate count. It's probably evidence of the main . . . it's just one conspiracy to commit fraud, not two separate charges. Okay. Thank you. Do you have anything else you'd like to present? My second . . . I think . . . My argument basically is that everything subsequent to obtaining the $511,000 is not part of the fraud. Then, those other cases where the person received his cut of the share, those cases were like if Akio had been the appellant or the defendant saying that, you can't hold me responsible because the fraud was complete once this other party received all the money. I'm just saying that in this case, Fatani is a transferee. He's not the receiver of the money. He's being held responsible for just sending money, not for wire . . . He shouldn't be held responsible for committing actual wire fraud. It might be a separate case of money laundering. I don't know, but it's not wire fraud when you just send a blank check. The law specifically says that the wire fraud has to be in furtherance of the scheme. I'm just saying that wire fraud was not in furtherance of the scheme. It might be something else, but I just don't think it's part of the main wire fraud crime. The second thing I wanted to argue was that the sentence was unreasonably long for Mr. Fatani. He received 36 months, and what I just was arguing was that the sentence was substantially unreasonable because basically, the presumption of reasonableness was provided because I think the sentencing factors were balanced just incorrectly. When you weigh the guideline range, the guidelines in this case aren't based on empirical evidence. When you weigh it against the other factors which Mr. Fatani had, which was . . . It's his first offense. He's got serious health problems, diabetes, high blood pressure, hyperthyroidism. He's got a bad back. He's . . . Were those considered by the district court? Excuse me? Were those considered by the district court? Yes, yes they were. Haven't we rejected the empirical research argument in the Simpson case and others? Well, I'm not saying that you have to reject the guidelines. The idea that you have to have an empirical research. Yeah. I'm just saying it's just when the guidelines aren't based on empirical evidence. I guess it's just weaker to use them. When you balance them . . . I'm just arguing this specific case. When you balance the weakness of the guidelines, the lack of empirical evidence versus the other factors involved, that when you weigh the factors, he should have got a sentence lower than what he did . . . A sentence below the guidelines basically. Yeah, the other factors he had was . . . He has zero history points. It's his first offense. He's threatened with deportation and he's taking care of his wife who's very ill. In conclusion, on the first account of wire fraud, I'm sorry, we were asking for finding an acquittal on the first issue. On the second issue for an unreasonably long sentence, we were asking for a reversal and remand back to the trial court. Thank you, Mr. Winogradis. Thank you. You've saved time for rebuttal, sir. May it please the Court, Loretta Berry for the United States. Here is the circumstantial evidence that establishes that the scheme to defraud the SBA was not complete . . . was funded on June the 5th because the conspirators still had to be paid. That was count 13 for Akeel and the fake payroll checks still had to issue in order for this SBA loan to be 100% forgivable. The jury heard the trial testimony of co-conspirator Navia. He testified that Akeel got half the proceeds from all these PPP loans. That's at record 1053 and 1068. In fact, one of the innocent borrowers, D. Singh, testified that Akeel told him that he keeps half of the proceeds. But really, Your Honors, it's the chronology of the withdrawals when considered contemporaneous . . . with the WhatsApp text messaging between Fatani and Akeel that is consistent with the two-fold purpose of this ongoing scheme. Just legally, though, you cite Kahn and Mays, correct? Those are both Supreme Court cases. I . . . Are those cases where the recipient isn't the co-conspirator? It's just an institution like a bank? It is. The Mays case is the only one I cited, Your Honor, that was cited by Arledge. I did not cite Kahn. I cited them for the propositions. I was just looking. I think it's page 32 when you're citing Arledge. Yes, sir. There's citation to Mays and Kahn. Okay. I cited those for the proposition under Arledge that Arledge cited both of those Supreme Court cases for the point that a scheme is not complete until all the conspirators receive the money irrevocably, until all the conspirators receive all of their disbursements. The cases, the factual . . . the facts of those cases are not identical to what is here, but the . . . Singh . . . Akeel didn't testify, did he? He did not. He pleaded guilty. Was there a stipulation about Singh, the owner of Taj Investments, or not? There was a stipulation that . . . the factual stipulation was that Fatani signed a blank check, gave it to Akeel, and Akeel wrote it out in his handwriting to Taj Investments. That was to Singh to buy a hotel. Let's say Fatani had just given Singh, whom he didn't know at all, and would you agree that would be subsequent to the PPP loan scheme? In other words, if it hadn't gone through Akeel? It would have been . . . that would have been something that Fatani would have wanted to use his money for. One of the . . . Right, but if Fatani wasn't part of the scheme, because you're not saying . . . I'm sorry. If Singh, the owner of Taj Investments, you've never said that he was part of the scheme. No. Okay. So if Fatani gets his cut, and he just later decides out of his bank account to pay a guy named Singh who knew nothing, that would post-date the scheme. That check would be very like the Mays con checks. That would not be part . . . that would be his use of this . . . Correct. Right. So it wouldn't count. It wouldn't count. It wouldn't count as . . . it would be . . . So it's crucial that he gives the blank check to Akeel, correct? It's crucial that it's used for fake payroll purposes or for . . . to pay off Akeel. Yes, Your Honor. Is paying the essential expenses of the fraud, this argument that we're discussing, is that really, though, most often used in the money laundering context? Is it unusual to have it here in the fraud context where it's the sender rather than the recipient? I'm not . . . Your Honor, I'm so sorry. I didn't hear the first part of your question. I'm sorry. Let me try to be a little louder. It's the essential expenses of the fraud. This exchange you've just been having, it's part of the fraud because they have to pay for his part of the fraud as opposed to just giving money out of the account to some third party. But isn't that concept . . . doesn't that come from money laundering cases where the issue is whether proceeds of the crime should be defined as gross receipts versus profits? And is it appropriate to use that concept here in this context where it's the sender of the money to the recipient as opposed to the RICO, the case that you've cited? The scheme here, the conspiracy to defraud, which appellant does not challenge, under 1346 . . . excuse me, 1349, the conspiracy was always a conspiracy to defraud the SBA. In terms of what I believe Your Honor is asking, if there was a type of a merger situation with a money laundering count, number one, that's been waived. But number two, as the district court correctly held, that type of situation, what the conspirators do with their proceeds is properly charged as money laundering, which appellant doesn't challenge on appeal, which is count 21. So here this was appropriately charged as a conspiracy to defraud the SBA for the purpose of obtaining the SBA money and dispersing it amongst themselves. And secondly, so that it never had to be repaid back. Those two elements are both the elements of the scheme to defraud that comprises count one, which isn't challenged, and the substantive count of count 13. Count 21, which is the money laundering charge, is not challenged on appeal. And the district court correctly held they were separate. Right. I understand it's separate. But opposing counsel, your friend on the other side, was talking about how it's really more akin to that and I'm testing that proposition. And so I have a follow-up question. In the RICO case, it's the recipient is the person. It would be a person akin to Akil's position, not Fatani's position. Do you know of any cases in any circuit where it's the sender who's on the hook for the wire fraud in this type of circumstance? The sender meaning Fatani? Yes. Directly analogous. Is there any case anywhere that is directly analogous where it's the sender rather than the recipient? Well, in the RICO case, that was the disbursement of the proceeds in the wire fraud. Right, but that's Akil's position in the case. He's the recipient. And in RICO, it was like the recipient. And so I'm asking if there is ever where the sender is on the hook in a wire fraud in any circuit across the country. I'm not saying that you're wrong in your theory. I'm asking if it's ever been proven out in a fact. I can't think of a case right on exactly on point. Because you understand that RICO is not directly on point because it's a little bit of a factual distinction. Well, let me say this then, Your Honor. And Arledge also. I think Arledge is more appropriately on point. What now? Arledge. But Arledge also has. . . Well, Arledge had conspirators, multiple conspirators in that case, Your Honor, and it was a settlement fraud scheme where a lawyer engaged in fen-fen settlement fraud with his conspirators. And in that case, he argued that the fraud was complete when the settlement funds were issued. And this court said, absolutely not. The fraud is not complete until all of the conspirators receive their funds and this lawyer himself until he received, until a wire that passed and he signed a release in order for him to receive his funds. So I think that the Arledge case is more analogous to these facts. And let me also point out again that the chronology of this case is incredibly important because after the funding of the loan, the first disbursement happens where Fatani signs a blank check. Akeel makes it out to A&H Hayward Investments, which is a company that's owned by Akeel and Chaudhary. That's only like a 10 percent cut. And as we know from the testimony, Akeel always got half. Then, on the 26th, the next big significant chunk that we are arguing about today, on page 16 of our brief is a screenshot from Fatani to Akeel on June 30th at 710 in the evening where Fatani says, $100,000 was just taken out just to update you. And in the same text, he tells him, when is the next payroll check? Those are the two overarching consistent themes of this scheme, that they were taking out disbursements and they wanted to know when the next payroll checks were going to issue so they would never have to pay back the money. That was after the loan was funded. Then again, two hours later, on page 17 of our brief, Fatani texts a picture to Akeel of all these fake payroll checks that he wrote out and he signed and some of the payees that were listed on there were from an employee list that they recycled. These conspirators recycled a list of names on these fake payroll checks. Then he sends him a text message and asks, on the 2nd of July, can I drop them now? Then, on the 11th, after these fake payroll checks are cashed, a WhatsApp screenshot, Fatani to Akeel, here's the available balance of the account. And then on the 14th, Fatani funnels all the money, all the leftover disbursements to himself. And there's no dispute that he transferred $100,000 to his other business, C Cellular. That's the money laundering account. But consistent throughout this entire time, from June to August, are text messages about these fake payroll checks. In our brief at page 19 is a picture of fake payroll checks that were taken from Akeel's office during a search warrant. Fatani signed them, sometimes he wrote payroll, sometimes he didn't. And he kept a really meticulous spreadsheet of every single withdrawal that went out of the account. And he sent it to Akeel. Finally, it's undisputed that Akeel and Fatani and Bajwa continued this scheme after the disbursement of the funds because he filed two EIDL loans. They applied for two EIDL loans after the funding of this Route 786 loan. That's not disputed. That's at record 1468-69, 1915, and 1935. So there was overwhelming evidence that this fraud and this scheme, the purpose of which was not to buy a hotel, that is what Akeel wanted to do with his proceeds. In fact, Akeel told the conspirators, whatever you do with your money, just make sure you're not flashy. Don't buy things just in cash. Remind me, I ask opposing counsel this, what was the defense at trial closing argument when they said the government didn't prove the elements of Count 13? The defense at trial in closing was that Akeel was the mastermind of the scheme, Your Honor. That was all that was advocated during closing. So Fatani, like all the others, were just duped. Correct. It was a scienter argument. Correct. And what do you understand the insufficiency argument to be now on appeal? I understand the sufficiency argument to be that the scheme was complete when the loan was funded. And your answer to that is, as you cited Arledge, that in a mail or wire fraud case, the scheme is not complete until all intended recipients of the money get it. Yes, Your Honor. That is correct. So the overwhelming circumstantial evidence establishes there was sufficient evidence when viewed in the light most favorable to the verdict to affirm on the wire fraud count. With respect to the substance of unreasonableness, Your Honor. Before you get there, you did suggest we could affirm on aiding and abetting. The jury wasn't instructed on aiding and abetting, was it? I believe that they were. If they weren't, that wouldn't be a theory we could affirm on, right? If they weren't instructed on it, no. But I know that they were charged. They were charged on it. It was charged in the superseding. Yes. But they would have to have been instructed on it. I would have to go back and check, Your Honor. I don't know at the moment. I can't recall. But the evidence is overwhelming to establish that this scheme, again, which the conspiracy to commit wire fraud under 1349 is the same facts that support that, which aren't challenged on appeal, support the scheme to defraud on the substantive wire count because it was in furtherance of defrauding the SBA. Again, count one is not challenged. So my argument would be, even if they weren't charged with aiding and abetting, there's overwhelming evidence to support the main charge. With respect to substantive unreasonableness, I would re-urge my arguments made in the brief that the challenge to the empirical basis is foreclosed in this circuit under Simpson. The court heard and read all of the defendant's arguments about criminal history. In fact, the court applied Amendment 821, recognizing that he had no criminal history, agreed that he was a zero-point offender, as did the government. So he got a break there. And the court, in its statement of reasons at Record 3612, mentioned that it considered the 3553A factors. Fittani cannot overcome the presumption of reasonableness that's afforded to this downward variant sentence. If there's no further questions, I respectfully request the judgment be affirmed. Thank you, Ms. Ferry. Mr. Winograd, you saved time for rebuttal. I have nothing further unless the court has any other questions. Do we have any? No. Thank you very much. We note, Mr. Winograd, that your court appointed, and we appreciate your service in this matter. Thank you. Thank you. And we appreciate both arguments in this matter. Thank you.